**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**BECKLEY DIVISION**

| | | |
|---|---|---|
| **FRANKFORD M. SEWELL,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION NO. 5:07-00642** |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**M E M O R A N D U M   O P I N I O N**

    This is an action seeking review of the decision of the Commissioner of Social Security denying Plaintiff's application for Disability Insurance Benefits (DIB), under Title II of the Social Security Act, 42 U.S.C. §§ 401-433. This case is presently pending before the Court on the parties' cross-Motions for Judgment on the Pleadings. (Document Nos. 18 and 22.) Both parties have consented in writing to a decision by the United States Magistrate Judge. (Document Nos. 4 and 5.)

    The Plaintiff, Frankford M. Sewell (hereinafter referred to as "Claimant"), filed an application for DIB on April 8, 2004, alleging disability as of March 6, 2000, due to a back injury, memory loss, high blood pressure, heart problems, and diabetes.[1] (Tr. at 76-78, 150.) The claim was denied initially and on reconsideration.[2] (Tr. at 53-55, 60-62.) On January 21, 2005, Claimant requested a hearing before an Administrative Law Judge (ALJ). (Tr. at 64.) The hearing was held on November 8, 2005, before the Honorable John T. Yeary. (Tr. at 549-80.) By decision dated

---

    [1] Claimant filed previous applications for DIB and SSI on January 31, 2002, and January 6, 2003 (protective filing dates), which claims were denied initially and on reconsideration. (Tr. at 16.)

    [2] On his form Request for Reconsideration, Claimant alleged balance problems as an additional disabling impairment. (Tr. at 58, 60.)

—

January 27, 2006, the ALJ determined that Claimant was not entitled to benefits. (Tr. at 16-27.) The ALJ's decision became the final decision of the Commissioner on August 24, 2007, when the Appeals Council denied Claimant's request for review. (Tr. at 7-11.) On October 16, 2007, Claimant brought the present action seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g). (Document No. 2.)

Under 42 U.S.C. § 423(d)(5), a claimant for disability has the burden of proving a disability. See Blalock v. Richardson, 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims. 20 C.F.R. §§ 404.1520, 416.920 (2006). If an individual is found "not disabled" at any step, further inquiry is unnecessary. Id. §§ 404.1520(a), 416.920(a). The first inquiry under the sequence is whether a claimant is currently engaged in substantial gainful employment. Id. §§ 404.1520(b), 416.920(b). If the claimant is not, the second inquiry is whether claimant suffers from a severe impairment. Id. §§ 404.1520(c), 416.920(c). If a severe impairment is present, the third inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4. Id. §§ 404.1520(d), 416.920(d). If it does, the claimant is found disabled and awarded benefits. Id. If it does not, the fourth inquiry is whether the claimant's impairments prevent the performance of past relevant work. 20 C.F.R. §§ 404.1520(e), 416.920(e). By satisfying inquiry four, the claimant establishes a prima facie case of disability. Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981). The burden then shifts to the Commissioner, McLain

v. Schweiker, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth and final inquiry: whether the claimant is able to perform other forms of substantial gainful activity, considering claimant's remaining physical and mental capacities and claimant's age, education and prior work experience. 20 C.F.R. §§ 404.1520(f), 416.920(f) (2006). The Commissioner must show two things: (1) that the claimant, considering claimant's age, education, work experience, skills and physical shortcomings, has the capacity to perform an alternative job, and (2) that this specific job exists in the national economy. McLamore v. Weinberger, 538 F.2d 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the Social Security Administration "must follow a special technique at every level in the administrative review process." 20 C.F.R. §§ 404.1520a(a) and 416.920a(a). First, the SSA evaluates the claimant's pertinent symptoms, signs and laboratory findings to determine whether the claimant has a medically determinable mental impairment and documents its findings if the claimant is determined to have such an impairment. Second, the SSA rates and documents the degree of functional limitation resulting from the impairment according to criteria as specified in 20 C.F.R. §§ 404.1520a(c) and 416.920a(c). Those sections provide as follows:

> *(c) Rating the degree of functional limitation.* (1)Assessment of functional limitations is a complex and highly individualized process that requires us to consider multiple issues and all relevant evidence to obtain a longitudinal picture of your overall degree of functional limitation. We will consider all relevant and available clinical signs and laboratory findings, the effects of your symptoms, and how your functioning may be affected by factors including, but not limited to, chronic mental disorders, structured settings, medication and other treatment.
> (2) We will rate the degree of your functional limitation based on the extent to which your impairment(s) interferes with your ability to function independently, appropriately, effectively, and on a sustained basis. Thus, we will consider such factors as the quality and level of your overall functional performance, any episodic limitations, the amount of supervision or assistance you require, and the settings in which you are able to function. See 12.00C through 12.00H of the Listing of Impairments in appendix 1 to this subpart for more information about the factors we

3

consider when we rate the degree of your functional limitation.

(3) We have identified four broad functional areas in which we will rate the degree of your functional limitation: Activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. See 12.00C of the Listings of Impairments.

(4) When we rate the degree of limitation in the first three functional areas (activities of daily living, social functioning; and concentration, persistence, or pace), we will use the following five-point scale: None, mild, moderate, marked, and extreme. When we rate the degree of limitation in the fourth functional area (episodes of decompensation), we will use the following four-point scale: None, one or two, three, four or more. The last point on each scale represents a degree of limitation that is incompatible with the ability to do any gainful activity.

Third, after rating the degree of functional limitation from the claimant's impairment(s), the SSA determines their severity. A rating of "none" or "mild" in the first three functional areas (activities of daily living, social functioning; and concentration, persistence, or pace) and "none" in the fourth (episodes of decompensation) will yield a finding that the impairment(s) is/are not severe unless evidence indicates more than minimal limitation in the claimant's ability to do basic work activities. 20 C.F.R. §§ 404.1520a(d)(1) and 416.920a(d)(1).[3] Fourth, if the claimant's impairment(s) is/are deemed severe, the SSA compares the medical findings about the severe impairment(s) and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder

---

[3] 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04, provides that affective disorders, including depression, will be deemed severe when (A) there is medically documented continuous or intermittent persistence of specified symptoms and (B) they result in two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence or pace; or repeated episodes of decompensation , each of extended duration or (C) there is a medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities with symptoms currently attenuated by medication or psychosocial support and (1) repeated extended episodes of decompensation; (2) a residual disease process resulting in such marginal adjustment that a minimal increase in mental demands or change in the environment would cause decompensation; or (3) a current history of 1 or more years' inability to function outside a highly supportive living arrangement, and the indication of a continued need for such an arrangement.

to determine if the severe impairment(s) meet or are equal to a listed mental disorder. 20 C.F.R. §§ 404.1520a(d)(2) and 416.920a(d)(2). Finally, if the SSA finds that the claimant has a severe mental impairment(s) which neither meets nor equals a listed mental disorder, the SSA assesses the Claimant's residual functional capacity. 20 C.F.R. §§ 404.1520a(d)(3) and 416.920a(d)(3). The Regulation further specifies how the findings and conclusion reached in applying the technique must be documented at the ALJ and Appeals Council levels as follows:

> At the administrative law judge hearing and the Appeals Council levels, the written decision issued by the administrative law judge and the Appeals Council must incorporate the pertinent findings and conclusions based on the technique. The decision must show the significant history, including examination and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each of the functional areas described in paragraph (c) of this section.

20 C.F.R. §§ 404.1520a(e)(2) and 416.920a(e)(2).

In this particular case, the ALJ determined that Claimant satisfied the first inquiry because he had not engaged in substantial gainful activity since March 6, 2000, his alleged onset date. (Tr. at 25, Finding No. 2.) Under the second inquiry, the ALJ found that Claimant suffered from a back disorder, depressive disorder, and cognitive disorder, which were severe impairments. (Tr. at 25, Finding No. 3.) At the third inquiry, the ALJ concluded that Claimant's impairments did not meet or equal the level of severity of any listing in Appendix 1. (Tr. at 25, Finding No. 4.) The ALJ then found that Claimant had a residual functional capacity for light exertional work as follows:

> The claimant has the residual functional capacity to perform light exertional work activity involving simple, routine tasks. He can occasionally climb, balance, stoop, crouch, crawl, or kneel; he should avoid concentrated exposure to extreme cold, vibration, and hazards (moving machinery, heights, etc.); and he experiences mild to moderate pain but could be attentive to and carry out the assigned work tasks.

(Tr. at 26, Finding No. 6.) At step four, the ALJ found that Claimant could not return to his past

relevant work. (Tr. at 26, Finding No. 7.) On the basis of testimony of a Vocational Expert ("VE")

taken at the administrative hearing, the ALJ concluded that Claimant could perform jobs such as a

fast food worker, small parts assembler, and cafeteria attendant, at the light level of exertion, and

as a small product assembler, food checker, and telephone worker, at the sedentary level of exertion.

(Tr. at 25-26, Finding No. 13.) On this basis, benefits were denied. (Tr. at 26, Finding No. 14.)

Scope of Review

The sole issue before this Court is whether the final decision of the Commissioner denying

the claim is supported by substantial evidence. In Blalock v. Richardson, substantial evidence was

defined as:

> evidence which a reasoning mind would accept as sufficient to support a particular
> conclusion. It consists of more than a mere scintilla of evidence but may be
> somewhat less than a preponderance. If there is evidence to justify a refusal to direct
> a verdict were the case before a jury, then there is 'substantial evidence.'

Blalock v. Richardson, 483 F.2d 773, 776 (4th Cir. 1972) (quoting Laws v. Celebrezze, 368 F.2d

640, 642 (4th Cir. 1966)). Additionally, the Commissioner, not the Court, is charged with resolving

conflicts in the evidence. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Nevertheless, the

Courts "must not abdicate their traditional functions; they cannot escape their duty to scrutinize the

record as a whole to determine whether the conclusions reached are rational." Oppenheim v. Finch,

495 F.2d 396, 397 (4th Cir. 1974).

A careful review of the record reveals the decision of the Commissioner is supported by

substantial evidence.

Claimant's Background

Claimant was born on January 28, 1957, and was 48 years old at the time of the

administrative hearing, November 8, 2005. (Tr. at 24, 76, 554.) Claimant had an eighth grade, or

6

limited education. (Tr. at 17, 556.) In the past, he worked as a lumber stacker and concrete finisher. (Tr. at 17, 557, 572-73.)

 The Medical Record

The Court has reviewed all the evidence of record, including the medical evidence, and will discuss it below in relation to Claimant's arguments.

Claimant's Challenges to the Commissioner's Decision

Claimant alleges that the Commissioner's decision is not supported by substantial evidence because the ALJ erred in not giving great weight to the opinion and residual functional capacity assessment of Claimant's treating physician, Dr. Jacob McNeel, D.O., without suitable explanation as to why he failed to give greater weight to Dr. McNeel's opinion. (Document No. 18 at 2, 7-11.) Claimant asserts that the ALJ "cited no objective medical evidence, only the opinions of the non-examining reviewing physicians, and an impartial vocational expert who testified at the hearing to support her assessment of mental and physical residual functional capacity." (Id. at 7.) Specifically, Claimant asserts that the ALJ failed to address the length of the treatment relationships, the extent of the treatment or specialization of the doctors providing opinions on RFC, or an explanation as to why Dr. McNeel's opinion was inconsistent with his treatment records, the assessment, and the other credible evidence of record, as required by 20 C.F.R. §§ 404.1527(d)(2)-(6) and 416.927(d)(2)-(6). (Id. at 9.) Claimant further alleges that the ALJ failed to mention Dr. McNeel's report to the West Virginia Department of Health and Human Resources, dated November 1, 2005, which indicated that Claimant was disabled due to his back pain and anxiety. (Id. at 10.) Thus, the ALJ failed to analyze and weigh all the evidence of record. (Id.) Finally, Claimant alleges that the ALJ improperly rejected Dr. McNeel's opinion in part because the ALJ found Claimant to be not entirely credible.

(Id.)

The Commissioner asserts that Claimant's arguments are without merit and that substantial evidence supports the ALJ's decision. (Document No. 22 at 8-15.) Specifically, the Commissioner asserts that the ALJ considered Dr. McNeel's treatment records and physical assessments but properly found that his own records, as well as the other evidence of record, did not support Dr. McNeel's assessment that Claimant was unable to perform full-time work. (Id. at 10.) The Commissioner points out that Dr. McNeel did not document the use of objective medical testing, but only Claimant's complaints of back pain. (Id. at 11.) Furthermore, Dr. McNeel's records do not contain additional information regarding Claimant's back condition after January, 2004. (Id. at 11-12.) Additionally, the Commissioner points out that Dr. McNeel's assessment was at odds with the other medical evidence of record. (Id.) The Commissioner notes that x-rays and MRI scans showed only mild degeneration of Claimant's spine, that he was able to participate fully in his pain management and physical therapy sessions, and that Dr. Landis found that all motor strength and sensory tests were normal. (Id.) Moreover, Dr. McNeel's opinions were inconsistent with the opinions of the state agency medical consultants. (Id. at 12-13.) Dr. McNeel's assessment also was inconsistent with Claimant's reported activities of daily living. (Id. at 14.) Contrary to Claimant's allegation, the ALJ specifically mentioned Dr. McNeel's November 1, 2005, opinion given to the West Virginia Department of Health and Human Resources. (Id.) The Commissioner therefore, contends that Claimant's arguments are without merit and that the ALJ's RFC assessment and weight accorded Dr. McNeel's opinions are supported by substantial evidence. (Id.)

Analysis.

At steps four and five of the sequential analysis, the ALJ must determine the claimant's

residual functional capacity for substantial gainful activity. "RFC represents the most that an individual can do despite his or her limitations or restrictions." <u>See</u> Social Security Ruling 96-8p, 61 Fed. Reg. 34474, 34476 (1996). Pursuant to SSR 96-8p, the RFC assessment "must be based on all of the relevant evidence in the case record," including " the effects of treatment" and the "limitations or restrictions imposed by the mechanics of treatment; e.g., frequency of treatment, duration, disruption to routine, side effects of medication." Looking at all the relevant evidence, the ALJ must consider the claimant's ability to meet the physical, mental, sensory and other demands of any job. 20 C.F.R. §§ 404.1545(a), 416.945(a) (2006). "This assessment of your remaining capacity for work is not a decision on whether you are disabled, but is used as the basis for determining the particular types of work you may be able to do despite your impairment(s)." <u>Id.</u> "In determining the claimant's residual functional capacity, the ALJ has a duty to establish, by competent medical evidence, the physical and mental activity that the claimant can perform in a work setting, after giving appropriate consideration to all of her impairments." <u>Ostronski v. Chater</u>, 94 F.3d 413, 418 (8th Cir. 1996).

Opinions on a claimant's Residual Functional Capacity are issues that are reserved to the Commissioner. The Regulations state that:

> We use medical sources, including your treating source, to provide evidence, including opinions, on the nature and severity of your impairment(s). Although we consider opinions from medical sources on issues such as whether your impairment(s) meets or equals the requirements of any impairment(s) in the Listing of Impairments in appendix 1 to subpart P of part 404 of this chapter, your residual functional capacity . . . or the application of vocational factors, the final responsibility for deciding these issues is reserved to the Commissioner.

See 20 C.F.R. § 416.927(e)(2) (2006).

> In determining what a claimant can do despite his limitations, the SSA must consider the entire record, including all relevant medical and nonmedical evidence, such as

9

a claimant's own statement of what he or she is able or unable to do.  That is, the SSA need not accept only physicians' opinions.  In fact, if conflicting medical evidence is present, the SSA has the responsibility of resolving the conflict.

Diaz v. Chater, 55 F.3d 300, 306 (7th Cir. 1995) (citations omitted).

The Regulations state that opinions on these issues are not medical opinions as described in the Regulation dealing with opinion evidence (20 C.F.R. §§ 404.1527(a)(2) and 416.927(a)(2)); rather, they are opinions on issues reserved to the Commissioner. 20 C.F.R. §§ 404.1527(e) and 416.927(e). For that reason, the Regulations make clear that "[w]e will not give any special significance to the source of an opinion on issues reserved to the Commissioner. . . ." Id. §§ 404.1527(e)(3) and 416.927(e)(3). The Regulations further provide that "[f]or cases at the Administrative Law Judge hearing or Appeals Council level, the responsibility for deciding your residual functional capacity rests with the Administrative Law Judge or Appeals Council." See 20 C.F.R. §§ 404.1545 and 416.946 (2006). However, the adjudicator must still apply the applicable factors in 20 C.F.R. § 416.927(d) when evaluating the opinions of medical sources on issues reserved to the Commissioner. See Social Securing Ruling ("SSR") 96-5p, 61 FR 34471, 34473 (1996).

Social Security Ruling 96-5p makes a distinction between an RFC assessment, which is "the adjudicator's ultimate finding of 'what you can still do despite your limitations,'" and a "'medical source statement,' which is a 'statement about what you can still do despite your impairment(s)' made by an individual's medical source and based on that source's own medical findings." Id. SSR 96-5p states that "[a] medical source statement is evidence that is submitted to SSA by an individual's medical source reflecting the source's opinion based on his or her own knowledge, while an RFC assessment is the adjudicator's ultimate finding based on a consideration of this

10

opinion and all the other evidence in the case record about what an individual can do despite his or her impairment(s)." Adjudicators "must weigh medical source statements under the rules set out in 20 C.F.R. § 416.927, providing appropriate explanations for accepting or rejecting such opinions." Id. at 34474.

Every medical opinion received by the ALJ must be considered in accordance with the factors set forth in 20 C.F.R. §§ 404.1527(d) and 416.927(d) (2006). These factors include: (1) length of the treatment relationship and frequency of evaluation, (2) nature and extent of the treatment relationship, (3) supportability, (4) consistency, (5) specialization, and (6) various other factors. Additionally, the Regulations state that the Commissioner "will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion." Id. §§ 404.1527(d)(2) and 416.927(d)(2).

Under §§ 404.1527(d)(1) and 416.927(d)(1), more weight is given to an examiner than to a non-examiner. Sections 404.1527(d)(2) and 416.927(d)(2) provide that more weight will be given to treating sources than to examining sources (and, of course, than to non-examining sources). Sections 404.1527(d)(2)(I) and 416.927(d)(2)(I) state that the longer a treating source treats a claimant, the more weight the source's opinion will be given. Under §§ 404.1527(d)(2)(ii) and 416.927(d)(2)(ii), the more knowledge a treating source has about a claimant's impairment, the more weight will be given to the source's opinion. Sections 404.1527(d)(3), (4) and (5) and 416.927(d)(3), (4), and (5) add the factors of supportability (the more evidence, especially medical signs and laboratory findings, in support of an opinion, the more weight will be given), consistency (the more consistent an opinion is with the evidence as a whole, the more weight will be given), and specialization (more weight given to an opinion by a specialist about issues in his/her area of

11

specialty). Unless the ALJ gives controlling weight to a treating source's opinion, the ALJ must explain in the decision the weight given to the opinions of state agency psychological consultants. 20 C.F.R. §§ 404.1527(f)(2)(ii) and 416.927(f)(2)(ii) (2006). The ALJ, however, is not bound by any findings made by state agency medical or psychological consultants and the ultimate determination of disability is reserved to the ALJ. Id. §§ 404.1527(f)(2)(I) and 416.927(f)(2)(I).

In evaluating the opinions of treating sources, the Commissioner generally must give more weight to the opinion of a treating physician because the physician is often most able to provide "a detailed, longitudinal picture" of a claimant's alleged disability. See 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2) (2006). Nevertheless, a treating physician's opinion is afforded "controlling weight only if two conditions are met: (1) that it is supported by clinical and laboratory diagnostic techniques and (2) that it is not inconsistent with other substantial evidence." Ward v. Chater, 924 F. Supp. 53, 55 (W.D. Va. 1996); see also, 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2) (2006). The opinion of a treating physician must be weighed against the record as a whole when determining eligibility for benefits.  20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2) (2006). Ultimately, it is the responsibility of the Commissioner, not the court to review the case, make findings of fact, and resolve conflicts of evidence. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). As noted above, however, the Court must not abdicate its duty to scrutinize the record as a whole to determine whether the Commissioner's conclusions are rational. Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974).

If the ALJ determines that a treating physician's opinion should not be afforded controlling weight, the ALJ must then analyze and weigh all the evidence of record, taking into account the factors listed in 20 C.F.R. §§ 404.1527 and 416.927(d)(2)-(6).

Respecting Claimant's physical impairments, the medical evidence reveals the following treatment and assessments.

*Hospital Records*.

Claimant injured his back while lifting a log at work on March 6, 2000. (Tr. at 18, 152, 205-06.) He was examined in the emergency room for complaints of low back pain on ambulation. (Tr. at 205.) A radiology report of Claimant's lumbosacral spine revealed minimal degenerative changes without significant marginal osteophytes or narrow disc space, or fractures of subluxations. (Tr. at 209.) On May 12, 2000, a comparison study with the March 6, x-ray revealed minor degenerative osteophytes at multiple levels but no significant change or acute injury. (Tr. at 208.) On July 6, 2000, an MRI demonstrated thoracolumbar osteoarthritic vertebral body lipping, degenerative disc disease and left of midline herniated disc at L5-S1, degenerative disc disease at C5-6, and loss of the usually seen cervical lordosis. (Tr. at 273-74.) The height, density, and disc spacing of Claimant's vertebrae were within normal limits. (Id.)

*Dr. Amores*.

On August 3, 2000, Dr. Constantino Y. Amores, M.D., conducted a neurological consultation of Claimant. (Tr. at 210-11.) Claimant reported aching and throbbing pain from the base of his neck down to the lumbar area, pins and needles type pain across the lumbosacral region, and pins and needles type pain in the anterior left thigh, as well as some numbness. (Tr. at 210.) A review of systems was normal. (Id.) The focus neurological examination revealed no focal deficit, though Claimant had some occasional tenderness in the dorsum of the left foot. (Id.) There was no evidence of radiculopathy or myelopathy. (Tr. at 210-11.) Straight leg raising was positive at ninety degrees bilaterally for localized pain across the lumbosacral area. (Tr. at 211.) Dr. Amores therefore, opined

13

that Claimant had a herniated disc at L5-S1 and recommended "conservative, non-surgical treatment." (Id.)

*Physical Therapy*.

Claimant underwent a series of eighteen physical therapy sessions from March 12, 2001, through May 22, 2001. (Tr. at 212-17.) Treatment included ice; electric stimulation; stretching, strengthening, and core stabilization exercises; and posture and body mechanics education. (Tr. at 212.)

*Dr. Landis*.

On June 19, 2001, Dr. A. E. Landis, M.D., an osteopathic surgeon, performed a low back examination for the West Virginia Workers' Compensation Office. (Tr. at 259-62.) Dr. Landis explained that after his initial work-related injury of March 6, 2000, Claimant returned to work a couple weeks later and re-injured his back in June, 2000, lifting a log. (Tr. at 259.) Dr. Landis noted that since this aggravation of his prior low back injury, Claimant was treated conservatively with medications and physical therapy. (Id.) An MRI Scan in July, 2000, revealed a herniated disc at the L5-S1 level in the midline. (Id.) Dr. Velasquez however, found no clinical indication of disc herniation and recommended conservative treatment. (Id.) Claimant attempted to return to work in January, 2001, but became sick to his stomach after shoveling sawdust for four hours. (Id.) Since then, Claimant underwent more physical therapy consisting primarily of an exercise program, which Claimant reported helped to some extent. (Tr. at 259-60.) Claimant switched his treatment to a chiropractor who administers electrical stimulation, massage treatments, traction, and manipulations, which helped for a brief period of time. (Tr. at 260.)

Claimant reported primary pain in the left side of his lower back that radiated into the left

14

lower extremity and occasional pain in the right side with some radiation into the right lower extremity. (Tr. at 260.) He described the pain as constant in nature, with some tingling and numbness in the left thigh. (Id.) The pain was increased with bending and prolonged sitting, standing, or walking. (Id.) The pain was made better with ice packs, muscle relaxers, a TENS unit, exercises, and Naprosyn. (Id.) Claimant reported that he did not wear a back brace or other support on his back. (Id.)

On examination, Dr. Landis observed that Claimant moved well without any restriction or limp. (Tr. at 260.) He exhibited reduced ranges of back motion with pain but no radicular component. (Id.) Claimant was able to heel and toe walk without difficulty, but had positive straight leg raising for pain. (Id.) Dr. Landis observed no motor weakness or muscle atrophy, and noted that sensation was intact throughout the lower extremities. (Tr. at 260-61.) Dr. Landis diagnosed a strain/sprain type injury to his lower back, which was superimposed on the pre-existing degenerative changes. (Tr. at 261.) He questioned whether there was any disc protrusion. (Id.) Dr. Landis recommended conservative treatment with an aggressive stretching exercise program with a physical therapist. (Id.) He also recommended that his medications be changed. (Id.)

On May 22, 2002, Dr. Landis re-evaluated Claimant's low back injury. (Tr. at 254-58.) Claimant reported that since the last exam, he unsuccessfully underwent chiropractic treatments. (Tr. at 254.) He was referred to the Oasis Pain Management Clinic, which helped to some extent. (Tr. at 255.) He also attended the Know Pain Clinic. (Id.) Claimant reported similar symptoms as before and noted that his back would pop when he rolled over in bed, which increased his back pain. (Id.) Claimant reported that he was unable to do any lifting without increased pain. (Id.) On examination, Dr. Landis noted decreased range of back motion with low back pain on all ranges without any

radiculopathy. (Id.) There were no spasms or deformity of the lumbar spine. (Tr. at 255-56.) He exhibited tenderness to light touch at L5-S1 in the midline. (Tr. at 256.) Claimant was able to heel and toe walk without difficulty, though straight leg raising again was positive with pain. (Id.) Dr. Landis again noted that there was no motor weakness or muscle atrophy. (Id.) Dr. Landis observed that Claimant's symptoms were magnified. (Id.) For instance, Claimant reported increased low back pain with light pressure on top of his head. (Id.)

The x-rays revealed some lipping at L3-4, moderate degenerative changes with narrowing at L5-S1, and anterior lipping to a mild to moderate extent throughout the lumbar spine except at L1-2. (Tr. at 256.) Dr. Landis noted however, that compared to the June, 2001, x-rays, there was no appreciable change. (Id.) Dr. Landis concluded that there was no clinical evidence of radiculopathy and opined that Claimant had reached his maximum degree of medical improvement. (Id.) He further opined that Claimant was "no longer temporarily totally disabled." (Id.) He suggested that the MRI findings were "falsely positive for disc protrusion." (Tr. at 257.)

    *Diagnostic Imaging Reports*.

On July 6, 2000, x-rays of Claimant's cervical, thoracic, and lumbar spine revealed thoracolumbar osteoarthritic vertebral body lipping. (Tr. at 273.) An MRI on the same date demonstrated degenerative disc disease and left of midline HNP at L5-S1, degenerative disc disease at C5-6, and loss of the usually seen cervical lordosis. (Tr. at 274.) An Adenosine Cardiolite Stress Test on September 4, 2002, revealed no evidence of infarct or ischemia, normal wall motion, and an ejection fraction of 65%. (Tr. at 270.) A further MRI Scan of Claimant's lumbar spine on October 24, 2002, demonstrated degenerative disc and joint disease at L4-5 and L5-S1 predominantly; right-sided predominance of protrusion at L4-5 and left-sided predominance of disc protrusion - herniation

16

at L5-S1 with associated facet arthropathy with left-sided predominance at L5-S1. (Tr. at 268-69.)

> *Oasis*.

Claimant participated in an occupational rehabilitation and pain management treatment program at Oasis Multidisciplinary Based Rehabilitation Services from August 28, 2001, through October 16, 2001. (Tr. at 218-38.) While in treatment, Claimant's exertional capacity increased from a sedentary-light to light level. (Tr. at 218, 220.)

> *The Know Pain Clinic*.

Claimant began treatment at The Know Pain Clinic on January 5, 2002, under the primary care of Dr. Shishir Shah, M.S., M.D. (Tr. at 275-95.) On January 5, 2002, Dr. Shah noted some mild midline lumbar tenderness, bilateral paravertebral tenderness, and bilateral sacroiliac joint tenderness. (Tr. at 18, 293.) Straight leg raising was negative with distraction. (Id.) Dr. Shah diagnosed lumbar spondylosis, facet arthropathy, sacral dysfunction, small herniated nucleus pulposus at L5-S1, and degenerative disc disease at C5-6. (Tr. at 18, 294.) On May 6 and June 4, 2002, Dr. Shah noted that there was no deficit in motor, sensory, or deep tendon reflexes. (Tr. at 19, 284, 289.) On June 4, straight leg raising was positive. (Tr. at 284.) On July 1, 2002, straight leg raising was guarded and Claimant was unable to perform accurately. (Tr. at 283.) Dr. Shah noted that Claimant had continued tenderness in the sacroiliac region and that Patrick's sign was positive bilaterally. (Tr. at 19, 283.) On August 30, 2002, Dr. Shah observed an antalgic gait, a positive Patrick's sign on the left side, and some difficulty walking on his heels and toes. (Tr. at 19, 277.) Dr. Shah administered lumbar facet joint and sacroiliac joint injections. (Tr. at 19, 278.)  On December 11, 2002, Dr. Shah noted localized tenderness over the left side, more specifically over the sacroiliac joint. (Tr. at 19, 275.) He noted some mild increased edema, and observed that

17

Claimant's straight leg raise was negative and that he was able to walk on his tiptoes. (Id.)

*Better Health Physical Therapy*.

Claimant underwent physical therapy from Robert Schuetz, LPT, at Better Health, Inc., from July 31, 2001, though April 11, 2003. (Tr. at 296-308.) On April 11, 2003, Mr. Schuetz noted that Claimant's only abnormality was the range of bilateral lower extremity motion. (Tr. at 19, 296.) Mr. Schuetz noted that as of his last visit on February 19, 2003, Claimant was functioning at light to moderate activities of daily living. (Tr. at 19, 297.)

*Kominsky Chiropractic Health Center*.

Claimant was under the care of Dr. Michael J. Kominsky, a chiropractor, at Kominsky Chiropractic Health Center from June 15, 2001, though April 18, 2003. (Tr. at 309-23.) Treatment included Cox flexion/distraction to reduce inflammation and muscle spasms and spinal manipulation. (Tr. at 322.) On November 1, 2001, Dr. Kominsky noted that Claimant's exertional capacity was at a light to medium level. (Tr. at 319.) On January 18, 2003, it was determined that Claimant functioned at "a light physical demand level." (Tr. at 311.)

*Dr. Lambrechts*.

On June 16, 2003, Dr. Marcel G. Lambrechts, M.D., completed a form Physical Residual Functional Capacity Assessment, on which he opined that Claimant was capable of performing work at the light level of exertion. (Tr. at 324-31.) He opined that Claimant had occasional postural limitations, should avoid concentrated exposure to extreme cold, and should avoid even moderate exposure to vibration. (Tr. at 326, 328.) Dr. Lambrechts concluded that Claimant's symptoms were slightly magnified and reduced his RFC accordingly. (Tr. at 329.)

18

*New River Health*.

Claimant treated at New River Health from March 13, 2000, through July 7, 2003. (Tr. at 332-95.) On July 11, 2000, Claimant was diagnosed with thoracolumbar back strain. (Tr. at 19, 379.) He received prescription medications and physical therapy. (Id.) On August 11, 2000, Dr. J. Michael Herr, D.O., diagnosed herniated lumbar disc and assessed total temporary disability for at least twelve weeks. (Tr. at 19, 377.) On December 1, 2000, Dr. Herr opined that Claimant was "able to return to work but not as a small mill laborer." (Tr. at 19, 373.) Dr. Herr noted on January 31, 2001, that Claimant walked with a mild limp with most weight on his right leg. (Tr. at 19, 366.) He also noted that Claimant's lumbosacral strain and chronic back pain was worsened with his recent work attempt. (Id.) Dr. Herr therefore opined that Claimant was unable to perform the routine activities of his job and returned him to temporary total disability status for eight weeks. (Id.) Dr. Herr noted gradual improvement and positive response to physical therapy on April 4, 2001, but assessed that Claimant would be totally temporarily disabled for an additional eight weeks. (Tr. at 19, 364.) On June 15, 2001, Claimant requested that the care of his back condition be transferred to his chiropractor, Dr. Kominsky, which request was approved by Dr. Herr. (Tr. at 19, 362.)

*Dr. McNeel*.

The medical evidence of record reflects Claimant's treatment with Dr. Jacob C. McNeel, D.O., from January 24, 2003, through October 22, 2004. (Tr. at 441-65.) On January 24, 2003, Claimant complained of back pain. (Tr. at 464.) Examination revealed generalized ropiness in the low lumbosacral spine, for which Dr. McNeel assessed general back pain and continued Claimant on Lortab, Soma, and Vioxx. (Tr. at 465.) On January 20, 2004, Dr. McNeel, also completed a form Medical Assessment of Ability to Do Work-Related Activities (Physical). (Tr. at 404-07.) He opined

19

that due to Claimant's peripheral vascular disease with leg pain, he was limited to lifting twenty pounds occasionally and no weight on a frequent basis. (Tr. at 404.) He opined that Claimant was able to walk or stand two hours in an eight-hour workday for fifteen minutes at a time, and could sit four hours in an eight-hour workday and one hour without interruption. (Tr. at 405.) He noted that edema was brought on by sitting. (Id.) Dr. McNeel noted that due to neuropathy of the feet and being a high risk of falling with balance activities, he was limited to climbing occasionally, and never balancing, stooping, crouching, kneeling, or crawling. (Id.) He assessed that Claimant's ability to reach, handle, feel, push or pull, and hear were affected by Claimant's angina and leg pain. (Tr. at 406.) He further assessed environmental limitations to include heights, temperature extremes, chemicals, dust, noise, and fumes due to Claimant's chronic COPD and balance problems. (Id.)

On February 24 and March 24, 2003, Claimant reported his pain at a level five out of ten and indicated at best, the pain is three out of ten in the afternoons. (Tr. at 462-63, 465) Dr. McNeel increased the Lortab and continued all other medications. (Tr. at 462-63.) On August 1, 2003, Claimant reported that driving made his back pain worse. (Tr. at 455.) Claimant exhibited no vertebral tenderness on February 13, 2004, and reported his pain at eight out of ten at its worst when riding in an automobile. (Tr. at 448-49.) On April 13, 2004, Claimant complained of pain in his back and legs, which had worsened since his last visit. (Tr. at 444, 446.) On October 22, 2004, Claimant reported general leg pain with associated aches and pain, which he described at the same severity as the last visit. (Tr. at 441.)

On January 3, 2005, Claimant complained of low back pain, which occurred off and on in frequency, with muscle spasms. (Tr. at 524.) He described the pain as burning in nature and rated the pain at a level seven out of ten. (Id.) Claimant stated that the pain had neither worsened nor

gotten better since the last visit. (Id.) On exam, Dr. McNeel observed lumbosacral ropiness and tenderness, as well as a gait limp on the left. (Tr. at 523.) On March 3, 2005, Dr. McNeel completed a second form Medical Assessment of Ability to Do Work-Related Activities (Physical). (Tr. at 492-95.) Dr. McNeel stated that Claimant could lift 30 pounds occasionally and ten pounds frequently, walk or stand three hours out of an eight-hour workday and for ten minutes without interruption, and sit four hours of an eight-hour workday and for 30 minutes without interruption. (Tr. at 493.) He assessed that Claimant could occasionally climb and balance but never stoop, crouch, kneel, or crawl. (Id.) Dr. McNeel attributed these limitations to Claimant's herniated disc documented in the MRI Report and restricted range of spinal motion. (Tr. at 492.) Dr. McNeel assessed no environmental restrictions but stated that Claimant's ability to reach and pull was limited due to increased strain on his lumbar spine. (Tr. at 494.)

From June 28, 2005, through August 30, 2005, Claimant did not report any back or leg pain, and it was noted on several occasions that there were no positive musculoskeletal findings. (Tr. at 496-517.) On November 1, 2005, Dr. McNeel completed a form General Physical (Adult) at the request of the West Virginia Department of Health and Human Resources, which stated that Claimant was unable to work full time at his customary occupation or like work due to anxiety and chronic back pain. (Tr. at 526-27.) He also stated that Claimant was unable to perform other full time work but stated no explanation for that opinion. (Tr. at 527.)

*RFC*.

On May 20, 2004, another form Physical Residual Functional Capacity Assessment was completed, though the physician's name is illegible. (Tr. at 408-15.) The reviewer restricted Claimant to performing work at the medium level of exertion with no postural, manipulative, or

environmental limitations assessed. (Tr. at 409-12.)

_Dr. Go_.

On November 8, 2004, Dr. Russ L. Go, M.D., completed a form Physical Residual Functional Capacity Assessment. (Tr. at 466-73.) Dr. Go opined that due to Claimant's back injury and pain, high blood pressure, diabetes, and memory loss, he was limited to performing work at the medium level of exertion with occasional limitations in climbing ladders, ropes, or scaffolds, and frequent limitations in climbing ramps or stairs, balancing, stooping, kneeling crouching, or crawling. (Tr. at 467-68.) Dr. Go noted that Claimant's reported activities of daily living included self-care, simple cooking, watching television, and visiting. (Tr. at 471.) He concluded that the medical and non-medical evidence however, did not support Claimant's alleged level of pain and restrictions. (_Id._)

The ALJ summarized the medical evidence of record, including the assessments and opinions of Dr. McNeel. (Tr. at 17-21.) The ALJ accorded little weight to Dr. McNeel's opinion that Claimant was unable to perform full-time work activity because his opinions were inconsistent with Claimant's reported activities of daily living and Dr. McNeel's treatment notes. (Tr. at 22.) The ALJ specifically noted that between January 3, 2005, to August 30, 2005, Dr. McNeel's medical reports did not mention Claimant's back impairment as a problem. (Id.) The ALJ noted as follows:

> The doctor reports neurological and musculoskeletal is usually within normal limits. On June 26, 2005, Mr. Sewell returned for medication refills and no complaints. On August 30, 2005, the claimant returned for follow-up on medication management and reported no new complaints. (Exhibit 26F).

(Tr. at 22.) As discussed above, Dr. McNeel's medical reports contained little or no reference to Claimant's back impairment for a period of several months. With the exception of one lower extremity strength exam, Dr. McNeel did not perform any objective testing to assess the severity of

Claimant's back pain. The other medical evidence of record likewise did not support Dr. McNeel's opinions that Claimant was unable to perform full-time work. Radiology reports revealed only mild to moderate degenerative changes with lipping and a questionable herniated disc as assessed by Dr. Landis, who opined that Claimant was not totally disabled. Dr. Landis opined that Claimant' pain and symptoms were magnified. Records from the physical therapists and chiropractor suggested that Claimant was capable of performing activities at the light level of exertion. Furthermore, the state agency reviewing physicians opined that Claimant was capable of performing at least light exertional level work with additional limitations to accommodate his back pain.

The ALJ also found that Claimant's reported activities were inconsistent with Dr. McNeel's finding that Claimant was unable to work. The ALJ noted that Claimant took care of his personal hygiene, watched television, listened to the radio, took walks, went to the post office, ran errands, washed dishes, received visits from friends and relatives, prepared simple meals, and did laundry. (Tr. at 22, 117-20, 167-73, 421.) Additionally, the ALJ noted that the medical records reflected Claimant's reports of fixing his mother's water pump, shoveling, lifting boxes, grocery shopping, pulling a load, trying to pick up a log, moving a small air conditioning unit, shoveling sawdust, mowing the grass, shoveling snow off the sidewalk, working out on a treadmill, helping a friend put a roof on a house, and taking road trips to Ohio and Virginia with his friends. (Tr. at 22-23, 299, 300, 302, 304-06, 317, 332, 339, 357, 363, 367, 375, .) These activities demonstrated to the ALJ that Claimant was not incapable of performing any work as indicated by Dr. McNeel. (Id.)

Claimant alleges that the ALJ failed to mention Dr. McNeel's November 1, 2005, report to the West Virginia Department of Human Resources, which stated that Claimant was disabled due to back pain and anxiety. (Document No. 18 at 10.) He therefore contends that the ALJ failed to

consider and weigh all the evidence as required by the Regulations. (Id.) Contrary to Claimant's allegations, the ALJ noted in his decision that "[o]n November 1, 2005, Dr. McNeel opined the claimant is not capable of performing full-time work." (Tr. at 22.) The ALJ determined however, that Dr. McNeel's opinion was inconsistent with his treatment notes and Claimant's reported activities. Dr. McNeel offered no explanation for his November 1, 2005, opinion. To the extent that the ALJ did not acknowledge Dr. McNeel's opinion that Claimant was unable to work due to anxiety, the Court finds that because Dr. McNeel was not a mental health specialist, he was not qualified to give such an opinion. Consequently, the ALJ properly did not accord significant weight to Dr. McNeel's opinion as it related to anxiety.

Contrary to Claimant's argument, the Court further finds that the ALJ properly discredited Dr. McNeel's opinion based on Claimant's unsupported subjective complaints. See Mastro v. Apfel, 270 F.3d 171, 178 (4th Cir. 2001) (finding that an ALJ may give lesser weight to a treating physician's opinion that "was based largely upon the claimant's self-reported symptoms."). Though Claimant does not challenge the ALJ's finding that Claimant's subjective complaints were not entirely credible, he asserts error in the ALJ's reliance on this finding as a basis for not according controlling weight to Dr. McNeel's opinion. The Court thus will not engage in a review of the ALJ's credibility analysis regarding Claimant's alleged symptoms and pain. As discussed above, Dr. McNeel's opinions do not cite any specific objective findings to support his opinions. Rather, they appear to be based on Claimant's subjective complaints, which the ALJ found not entirely credible. Accordingly, the Court finds that such reliance by the ALJ was proper and in accordance with the controlling case law.

Accordingly, the undersigned finds that the ALJ's decision to accord little weight to the

24

opinions of Dr. McNeel because they were inconsistent with his treatment notes, the other medical evidence of record, and Claimant's activities is supported by substantial evidence of record.

After a careful consideration of the evidence of record, the Court finds that the Commissioner's decision is supported by substantial evidence. Accordingly, by Judgment Order entered this day, the Plaintiff's Motion for Judgment on the Pleadings (Document No. 18.) is **DENIED**, Defendant's Motion for Judgment on the Pleadings (Document No. 22.) is **GRANTED**, the final decision of the Commissioner is **AFFIRMED**, and this matter is **DISMISSED** from the docket of this Court.

The Clerk of this Court is directed to send a copy of this Memorandum Opinion to counsel of record.

ENTER: March 30, 2009.

R. Clarke VanDervort
United States Magistrate Judge

25